(36 South. 926.)

No. 14,740.

CRICHTON et al. v. WEBB PRESS CO., Limited.*

(June 6, 1904.)

CORPORATIONS—CONTRACTS WITH DIRECTORS— RIGHTS OF MINORITY STOCKHOLDERS —DIVIDENDS.

1. Where the same five persons compose both the directorate and the body of the stockholders of a corporation, two of these persons cannot, by joining with a third, enter into contracts with the corporation, or fix their own salaries, or vote allowances to themselves, over the protest of their two other associates. It is not possible for a person to be on both sides of a contract, and equity will not permit the members of a corporation, whether as directors or as stockholders, to vote to themselves the money of the corporation over the protest of their associates.

2. Ordinarily there is no trust relation between the stockholder and the corporation, but the reason is that ordinarily the stockholder has no mandate to administer the affairs of the corporation; but, if stockholders undertake to discharge the functions of directors and conduct the affairs of the corporation, they become subject to the same trust relation which precludes directors from contracting with themselves to the detriment of the corporation.

3. Where the majority of the stockholders of a corporation, who were also the sole managers of its business, have gone on, over the protest of the minority, and dealt with themselves, and the court, on the complaint of the minority of the stockholders, cannot approve the basis upon which the business has been carried on, a situation is presented with which the court must deal as best it can under the circumstances, even though its intervention involves the proposition of reforming the contract between the corporation and the majority of stockholders, or revising the basis for the apportionment of the profits of the business.

4. On complaint of the minority stockholders, and on proper showing, the court will order the board of directors of a corporation to declare a dividend.

(Syllabus by the Court.)

Appeal from Second Judicial District Court, Parish of Webster; John Thomas Watkins, Judge.

Action by Thomas and J. E. Crichton against the Webb Press Company, Limited.

---

*Rehearing denied June 29, 1904.

Judgment for defendant, and plaintiffs appeal. Reversed.

Sutherlin & Barret, Stewart & Stewart, and Alexander & Wilkinson, for appellants. Lynn Kyle Watkins (Wise, Randolph & Rendall, of counsel), for appellee.

PROVOSTY, J. This suit is brought by two minority stockholders to compel the defendant corporation to declare a dividend. Incidentally, and in order to increase the dividend, the further relief is prayed that certain allowances of salary and certain contracts allowed and made by the majority to and with themselves be annulled. The individuals composing the majority are made parties defendant, together with the corporation itself. The history of the case is this:

In May, 1895, the two brothers, Samuel J. and Robert D. Webb, obtained a patent for a cotton compress of the invention of S. J. Webb. They valued it at $50,000. Not having command of the capital or credit required to put the invention to an actual test by building one of the compresses and putting it in operation, they offered to sell a half interest in the patent to one of the plaintiffs and certain other parties. The latter preferred an arrangement by which they should go security for the Webbs for the building of the press, and in consideration thereof should have an option to buy within a limited time. This was done and the press was built. It proved successful; but the option was permitted to run out without having been availed of—why, is not explained. After the option had expired, the two Webbs sold to the two plaintiffs, Thomas and James Crichton, a 16 per cent. interest in the patent for $8,000. The Webbs and the Crichtons then proceeded to exploit the patent by launching a business of compress building, under the firm name of S. J. Webb & Bro. The venture proved in a high degree successful. In the very first year, 1895, a net profit of $16,942.26 was

realized. It was then deemed advisable to organize a corporation to carry on the business, and this was accordingly done. The date of the incorporation was the 2d of January, 1896. The incorporators were the same parties who were owners of the patent, with the addition of J. Y. Webb, a nephew of S. J. and R. D. Webb, who took one share. The name of the corporation was S. J. Webb Company, Limited. Its capital stock was fixed at $100,-000, divided into shares of $100. The entire stock was subscribed by the incorporators, owners of the patent, and in the same proportion in which they were owners, except, as already stated, that one share was taken by J. Y. Webb. It may be as well to mention here that the parties continued thereafter to hold the stock in the same proportion—that is to say, as follows: Thomas Crichton, 10 shares; James E. Crichton, 6 shares; R. D. Webb, 20 shares; S. J. Webb, 63 shares; and J. Y. Webb, 1 share—and that they so hold it up to the present time. It may also be mentioned here that shortly thereafter J. Y. Webb acquired an interest in the patent corresponding with his interest in the corporation; that is to say, a 1 per cent. interest.

While the immediate purpose of the organization was to exploit this patent, the scope of the corporation was not so limited, but was made more comprehensive; the language of the charter being as follows:

"That the purpose and object of this corporation is to buy, sell, build, erect, operate, lease, or rent out compresses or compress machinery under such patent rights as this company may buy, lease, or acquire the agency of, or use and own in its own corporate right, and to procure, own, manufacture, or cause to be manufactured or be made such machinery as may be necessary or useful for carrying out the purposes stated, and to own such necessary warehouses, tools, equipments, lands, and property, real and personal, for the furtherance of the business of the corporation."

The charter provided that the stockholders should meet at the office of the company on the first Monday of January of each year without special call; that postponed and called meetings of the stockholders could be held on due notice by the president, setting forth the object of the meeting. The charter also provided that a board of directors, to consist of five stockholders, three of whom should constitute a quorum, should be elected at the regular meeting on the first Monday of January of each year; the first board, however, to be composed of the five incorporators, viz., S. J., R. D., and J. Y. Webb, and Thomas and James Crichton, who should hold office until their successors were elected and had qualified. The charter further provided that the board of directors should conduct the business and affairs of the company, and elect the officers of the company, and fix their salaries, and should prescribe the powers and duties of the officers, with the condition, however, that their said acts in respect to the powers and duties and salaries of the officers should be subject to ratification by the stockholders. The officers were to be a president, a vice president, a secretary, and a treasurer, and such other officers as the board of directors might deem necessary to conduct the business of the company.

On the day of the organization, January 2, 1896, the board of directors met and elected the following officers: S. J. Webb, President; Thomas Crichton, Vice President and Treasurer; R. D. Webb, Secretary—and adopted resolutions to the following effect:

First. A resolution leasing the compress patent from the owners thereof. That is to say, the two Webbs, S. J. and R. D., and the two Crichtons, leased the patent to the corporation, whereof they themselves held the entire stock, except the one share held by J. Y. Webb. The rental was fixed at $5,000 for each compress the company should sell or build, or cause to be sold or built, and $1,000 for each "movement" the company should put, or cause to be put, into a Morse or any other compress; payment to be made upon erection of the machinery.

Second. A resolution authorizing the presi-

dent and the secretary to make and sign all contracts for the company.

Third. A resolution accepting the proposition of S. J. Webb to work for the company during the year 1896 for $150 a month, "reserving to himself the right to all new inventions or improvements of whatsoever nature he may make."

Fourth. A resolution to the effect that S. J. and R. D. Webb "should have all the profits on any press of their patent in Cleburne, Texas."

On the next day, a meeting of the stockholders was held, and all the proceedings of the meeting of the board of directors of the preceding day were approved and ratified. J. Y. Webb was not at that time a part owner of the patent, but, as already stated, he afterwards acquired an interest in it corresponding with his interest in the corporation; that is to say, a 1 per cent. interest. The necessity of such an interest being transferred to him in the patent arose from the fact that the agreement to pay $5,000 per press to the owners of the patent was not intended by the parties to be carried out, but was a mere convenient arrangement for transferring the net profits of the company, which would approximately be of that amount per press, from the company to the owners of the patent; in other words, from the stockholders as stockholders to themselves as individuals. As shall be seen presently, the profits of the company on the 90-inch press soon fell below $5,000 per press, so that, if that contract had been genuine, the company would soon have had to retire from it, which it had the right to do at any time under the terms of the contract, unless it chose to run with the certainty of a loss.

No other meeting, either of stockholders or of directors, seems to have taken place until the 30th of November of the same year, 1896, when there was a meeting of stockholders. S. J. and R. D. Webb had in the meantime attended to the business of the company and with brilliant success. At that meeting resolutions were adopted to the following effect:

First. A resolution changing the name of the corporation to that of Webb Press Company, Limited; the charter and business of the company to remain unchanged and unaffected.

Second. A resolution transferring to the corporation the assets of the partnership of S. J. Webb & Bro., by which the business had been conducted previous to the organization of the corporation.

Third. A resolution levying an assessment upon the stockholders in proportion to their holding, so as to produce a sum of $5,000; each stockholder to furnish for his share of the assessment his note falling due March 1, 1897.

The stockholders did not meet again until the 29th of January, 1901, which meeting was very important, and will be duly noticed. The only meetings of the board of directors were in February, March, and December, 1898. At these meetings, the following resolutions were adopted:

First. A resolution ratifying certain contracts entered into by the president and the secretary of the company.

Second. A resolution fixing at $3,700 and $3,000, respectively, the salaries of S. J. and R. D. Webb, "reserving all inventions or discoveries to themselves, same as if not employed by the company."

Third. A resolution authorizing S. J. Webb "to place new presses as he thought best."

The regular stockholders' meetings of January, 1897, 1898, 1899, 1900, and 1901, were not held, owing to the absence of a majority of the stock; i. e., of S. J. Webb, or of the stock held by him. During all this time the affairs of the company under the management of S. J. and R. D. Webb continued highly prosperous.

During this same time S. J. Webb had

made numerous improvements to the compress, and had utilized them in the business of the company; and finally he had invented what he considered to be a new compress, known in this case as the "80-inch press," to distinguish it from the patented press, known as the "90-inch press." Out of these inventions, or as a result of them, have grown, in the main, the differences between the parties, who have been unable to agree what amount, if any, the Webbs should charge the corporation for the use of their inventions.

Some of the improvements were put on in the very first year of the company's business; that is to say, in 1896. Others were added as made. The Crichtons would not admit that the use of these improvements was beneficial to the company, nor that the charges made for them by the Webbs were reasonable; but the Webbs had the business of the company in hand, and went on using the improvements, and the questions of the right to use them and of the proper amount to charge for their use remained open.

In 1899 the Webbs solicited and obtained the consent of the Crichtons that the company should build one of the 80-inch presses, as an experiment; the Webbs agreeing to hold the company harmless against any loss. The result proved highly satisfactory, and demonstrated the superiority of the 80-inch press over the 90-inch.

The record does not show at what time of the year 1899 the first 80-inch press was built, but by the 1st of January, 1900, the time for the regular meeting of the stockholders, three 80-inch presses had been built; and it had become evident to the Webbs, who had entire and exclusive charge of the company's business, that the 80-inch press would have to supersede the 90-inch entirely. In fact, after the trial and demonstrated success of the 80-inch press, the company built only one 90-inch press, and the record does not show whether the contract for it had not been entered into previously.

The invention of this new press brought an unforeseen complication in the business of the company. The Crichtons were part owners of the 90-inch patent, for the lease of which the company was under contract to pay $5,000 per press, and they owned no interest in the new invention; and naturally the Webbs, owners of the new invention, wanted to be paid for the use of it. They had not yet obtained a patent, and did not obtain one until December 16, 1902, seven months after the institution of this suit, which was filed May 3, 1902; but, all the same, the thing was theirs, and they were not disposed to let the company have the use of it without payment. They demanded the same rental which the company was under contract to pay for the use of the 90-inch patent. The Crichtons insisted that the 90-inch patent was a good press, which had practically driven all competitors from the field, and that the company should go on using it. They objected to the use of the 80-inch invention, and especially objected to paying so large a rental. The Webbs, on their side, insisted that the 80-inch press was a better press in every way, stronger, safer, and cheaper, and that if it was not adopted by the company they would have to dispose of it to others, and that it would easily drive the 90-inch press out of the market; and we may mention here that the testimony leaves no doubt that such was the fact. Also, we may say here, as well as later, .that their right to exact payment for the use of their invention cannot be doubted. It was theirs, and, of course, they could exact payment for the use of it. Not only there is nothing in the patent law that could prevent their doing so, but section 4899, Rev. St. U. S. [U. S. Comp. St. 1901, p. 3387], impliedly recognizes a right of ownership in an unpatented invention.

The net profits on the three 80-inch presses

erected in 1899, after deduction of the $15,-000 rental to the Webbs and the proportionate share of these three presses in the general expenses of the company, such as salaries, etc., was $3,380.63. The net profit on the six 90-inch presses erected in the same year, after deduction of $6,000 for royalties on improvements, and the proportionate share of these six presses in the general expenses of the company, such as salaries, etc., was $21,-381.23.

It is thus seen that the profits from the 80-inch press were very much larger; that the 80-inch press yielded a profit of $1,126.88 per press, after deduction of $5,000 per press by way of royalty, whereas the 90-inch press yielded a profit of only $3,563.54 per press after a deduction of only $1,000 per press by way of royalty. So that, if the owners of the 90-inch patent had held the company to the payment of the $5,000 agreed to be paid for the lease of the patent, the company, by building the 90-inch presses, would have been operating at a net loss of $1,436.46 for every press it would have sold. The difference between the parties, then, could not be, and was not, in connection with the relative merits of the two presses, nor in regard to which press it was to the best interest of the company, as a company, to adopt and advocate, but it was simply and purely in view of the fact that the Crichtons were part owners of the 90-inch press and had no interest in the 80-inch invention, and that while the company, as a company, would lose $1,436.46 per press by building the 90-inch presses, and per contra gain $1,126.88 per press by building the 80-inch press, they (the Crichtons) would individually gain more if the company would adhere to the 90-inch pattern.

By the time the 1st of January, 1900, came around, when the regular annual meeting of the stockholders should take place, the question of using the 80-inch press in the business of the company and what charge should be made for it had reached the acute stage.

Unfortunately S. J. Webb, the main party in interest, was absent, and no final agreement could be arrived at in the matter. All that could be done was to adopt a modus vivendi until his return. He was to be back by March 1st; that is to say, in two months. It was agreed that the Crichtons should then be let out of the company, on a full and final settlement of the 90-inch press business, and that in the meantime the company should go on selling and advocating the sale of both presses, and the business of the two presses be kept separate on the books as far as possible, and the Webbs take all the profits of the 80-inch press business.

But S. J. Webb did not return by the 1st of March, as expected, nor until the following January, being busy at the foundries seeing to the construction of presses and traveling over the country selling presses. During the year 1900, owing to sharp competition, the profits of the company on the 80-inch press business had fallen below $5,000 per press, so that there could no longer be any question of paying to the Webbs that amount per press for the use of their invention, and the necessity of arriving at some definite and final agreement in the matter had become all the more imperative.

The regular meeting of the stockholders of January 1, 1901, failed for the same cause which had prevented the meeting of the previous January—the absence of S. J. Webb. But a meeting was called for January 29, 1901, and the Crichtons were duly notified to attend. Knowing, however, what business it was proposed to bring up before the meeting, and also knowing that they would be outvoted by the Webbs, they stayed away. The meeting took place without them. Important matters were voted on, but not the question of superseding the 90-inch press by the 80-inch press in the business of the company. That question was left for a subsequent meeting, which was called for the 9th of February, and the Crichtons were again duly noti-

fied to attend. The meeting was duly held, and again the Crichtons kept away.

At the first of these meetings, that of January 29th, . the following resolutions were adopted:

First. A resolution directing that the certificates of stock to which each stockholder was entitled be issued to him.

Second. A resolution approving and directing the secretary to pay an account of J. S. Webb for $6,821.30, without stating what the account was for; also, an account of S. J. Webb & Bro. of $520, for tools, tackle, etc., and $7,000 "for profit made on the press sold in Cleburne, Texas."

Third. A resolution approving, and directing the secretary to pay, the account of S. J. Webb & Bro. of $26,000 for royalties for use of improvements in 23 90-inch presses.

Fourth. A resolution approving, and directing the secretary to pay, the account of S. J. Webb & Bro. of $15,000 for royalties on three 80-inch presses erected in 1899.

At the meeting of February 9th the following resolutions were adopted:

First. A resolution reading as follows:

"The question of the company selling, building, using, and making contracts for the 80-inch compresses and other inventions and improvements other than presses covered by U. S. patent 539,-496, issued May 21, 1895 (the 90-inch press patent) was discussed. It was unanimously voted to continue this year selling, building, using, and making contracts for the 80-inch press and other inventions and improvements, and pay to S. J. Webb & Bro. all the profits made from this part of the business of the company."

Second. A resolution reading as follows:

"It was unanimously resolved to pay to S. J. Webb & Bro. all the profits of the business of the year 1900, last year, that accrued from selling, building, using, and making contracts for the 80-inch compress and other inventions and improvements, exclusive of presses covered by the U. S. patent 539,496, (90-inch press) issued May 21, 1895, to S. J. and R. D. Webb, and to pay to the owners of the latter patent all the profits that may accrue from selling, building, using, and making contracts for compresses under same."

Third. A resolution disposing of a few matters of business detail, as to which there was, and is now, no dispute.

By these resolutions the Webbs, holding a majority of the stock, decided in their own favor every issue between them and the Crichtons. Anticipating such a result, and foreseeing that there would no longer be any profits for them, the Crichtons had asked to be let out of the company upon a settlement which would leave out of computation the amounts claimed by the Webbs for royalties on their improvements and for the use of the 80-inch invention, which amounts the Webbs, as managers of the company, had caused to be charged up against the company on the books. The Webbs were willing to let the Crichtons retire from the company, but they insisted that the settlement should be made according to the books of the company; that is to say, including the disputed charges. They were willing, in addition, to allow the Crichtons $1,200 for their interest in the discredited 90-inch patent. In the alternative, they were willing to sell to the Crichtons an interest in the 80-inch invention corresponding with that which they held in the 90-inch patent. They fixed the price at the same figure of $50,000 at which the 90-inch patent had been valued. This would have removed the bone of contention and ended all controversy. The Crichtons refused to buy such an interest, assigning as their reason that they would have no assurance that S. J. Webb would not produce some new invention to supplant the 80-inch press, which, in turn, they would have to buy, and so on ad infinitum.

Not succeeding in obtaining an amicable settlement, the two Crichtons brought a suit for the appointment of a receiver to manage the affairs of the company. That suit was filed on October 26, 1901. The petitioners alleged that the Webbs voted enormous and exorbitant salaries to each other, and voted and paid over to S. J. Webb and to Webb & Bro. large sums of money by way of royalties for the use of so-called improvements, which allowances were unauthorized and unjustifiable

under the charter, but were grossly excessive, and that all this was done for the sole purpose of absorbing the revenues of the company and defrauding the petitioners.

They alleged, further, that the Webbs were holders of a majority of the stock of the company, and had the management of its affairs entirely in their own hands, as well as all the funds of the company, and were so conducting the business of the company as to divert to themselves all the profits of the company, which were large, and so as to defraud the petitioners of their rights, all of which amounted to gross mismanagement of the affairs of the company and made the appointment of a receiver necessary.

The Webbs denied these allegations, and averred that they had managed the affairs of the company well, and with the consent and approval of the plaintiffs, and in accordance with the charter, and finally averred as follows:

"Your respondents aver that there is no necessity for a receiver to be appointed, and that the complainants have legal recourse in other ways, if legal means are necessary for settlement, which your respondents deny, and aver that, if a receiver is appointed, it will ruin the business of the company and prostrate the most flourishing compress corporation in the world, and destroy assets of great value to your respondents, without any benefit to the plaintiffs."

That suit resulted in a judgment in favor of defendants. The plaintiffs appealed to this court, but the appeal was dismissed for informalities. That was in February, 1902.

The present suit was filed May 3, 1902. As already stated, it is for a dividend, and incidentally for a settlement of the affairs of the corporation up to date, with a view to ascertaining what the amount of this dividend should be, and also for the annulment of certain contracts made by the majority with themselves, and also of certain allowances of expense accounts and salaries and royalties by the majority to themselves.

The allegations are virtually the same as in the suit for the appointment of the receiver. The nullity of the allowances is claimed on the ground that the majority could not vote to themselves the property of the company, or could not make contracts with themselves to the detriment of the company.

Exceptions were filed to the form of the proceeding, but they are not now insisted on; the defendants seeming to be willing that the court should, as far as possible, pass upon the merits of the controversy.

The Webbs, as a matter of course, deny that the allowances of salary are too large, or that the charges for royalties for use of the improvements and of the new 80-inch press invention are excessive; and they insist that the action of the stockholders at the meetings of January 29, and February 9, 1901, is conclusive, and that the Crichtons have neither in law nor in fact any ground of complaint. They contend that the Crichtons consented to the arrangement by which all the profits of the company arising from the exploitation of the 80-inch invention, or of the other inventions or improvements, should go to them (the Webbs), and they contend that up to the filing of the present suit the Crichtons had made no claim to participation in these profits.

At the request of the plaintiffs the court appointed experts to make a statement of the financial position of the company as appearing on the books. The report of these experts is in the record, and is conceded to be a correct statement from the books. The disputed items, having been charged upon the books, are included in the report, and affect its totals and balances, so that, if any of them are rejected, the figures will have to be recast.

Under these facts and under the pleadings the questions arising are, first, as to whether the court should order a dividend; second, in case a dividend is ordered, what should be the amount thereof; third, as to

the salaries of the Webbs for managing the affairs of the company; fourth, as to their expense accounts; fifth, as to what amount should be allowed them for royalties on the improvements to the 90-inch press; sixth, as to the resolution allowing S. J. and R. D. Webb $5,000 per press on the three 80-inch presses erected in 1899; seventh and last, as to whether they should be allowed to take the entire profits of the business of the 80-inch press, and, if not, then how much they should be allowed for the use of their invention.

Preliminary to taking up the discussion of these matters, it is necessary to dispose of the contention of defendant that all these points have already been finally decided by the corporate authorities.

That contention is evidently without force. Evidently a person cannot be judge in his own case, cannot be on both sides of a contract, cannot vote to himself the money of his associates in a corporation. Defendants admit that this is so in the case of a director, but contend that it is not so in the case of a stockholder, because the same trust relation which exists between a director and the corporation in which he is director, precluding him from acting for the corporation in any matter in which his interest is adverse to that of the company, does not exist between the stockholder and the company. Undoubtedly no trust relation ordinarily exists between the stockholder and the corporation; but the reason is that ordinarily the stockholder is a stranger to the management of the affairs of the corporation, which is the province of the directors. If, however, in any particular case the stockholders have authority to manage the affairs of the corporation—in other words, to discharge the functions of directors, and undertake to do so—they, for all the purposes of the affairs thus managed, become directors in fact, and occupy, for the purposes of such affairs, precisely the

same relation of trust which directors ordinarily hold towards the corporation. This trust relation is not a matter of statutory law, or of technical law, but is simply the logical consequence of the impossibility of being judge in one's own case, or of being on both sides of a contract.

It is therefore a question of no importance whether the stockholders of this company had, or had not, authority under the charter to manage the affairs of the company. The stockholders and the directors were the same five persons, and it is a perfectly plain proposition that they could not assume, or divest themselves of, this trust relation towards the company as they might change their coats. As a matter of fact, however, the stockholders did not have authority to manage the affairs of the company. It is a fundamental principle of the law of corporations that stockholders have no mandate to act for the corporation. 10 Cyc. 760; Cook, Corp. (4th Ed.) p. 34, § 11. A corporation whose affairs could be managed indifferently by its stockholders or by its directors would be a nondescript and highly anomalous corporation. Of course, the charter might so provide; but no charter would be so interpreted unless a construction more in consonance with what ordinarily obtains were impossible. In the present case the charter does contain a clause which, taken literally, expresses that idea; but the context of that clause shows that its purpose was merely to regulate the proportion of vote that should be required at the meetings of stockholders to decide the different questions with which the stockholders might have to deal, and also, if taken literally, it would conflict with another clause, by which it is provided that the affairs of the company are to be conducted by the directors. However, the question, we repeat, is of no importance, since the Webbs, no more as stockholders than as directors, could be final judges in

their own case, and vote to themselves the money of the corporation, over the objection and protest of their associates in the corporation.

In justice to the Messrs. Webb, we hasten to add that the implication of moral wrong attaching to the act of voting on a matter in which one has a personal interest does not arise in this case, inasmuch as they constituted a majority both of the stockholders and the directors, and were sole managers of the affairs of the company, and therefore had to pass upon all questions pertaining to the business of the company, including those in which they had a personal interest. Necessarily, however, their decision on all questions where their personal interest came in conflict with that of the corporation was made subject to review by a court of equity at the suit of their complaining associates, as in the present case.

Proceeding to adjudicate upon the disputed points, the court finds that a dividend should have been declared and should now be ordered. The company began business with a capital of $26,000, to which was added the notes of the stockholders to the amount of $5,000. Its profits, according to the report of the experts, amounted in November, 1902, to $294,683.55. While the business of the company has increased very largely, and the actual cash in bank is very low, yet the court thinks a dividend of $50,000 could be safely declared, and the court will so order.

The court finds that the general expenses, amounting to $38,864.55, are charged in lump sums without detail of items. The court is morally convinced that the charges are legitimate; but there is no evidence of the fact beyond the charge itself. On this point the case will have to be remanded, with instructions to the lower court to require detailed accounts to be furnished, and with further instructions that unless, upon inspec-

tion, these accounts are found to be grossly exaggerated, there will be no ground for interference by the court.

The royalties for the use of the improvements to the 90-inch press are overwhelmingly shown to be just and fair, and are approved, and the $5,000 per press allowed on the three 80-inch presses erected in 1899 is not so far out of the way as to justify the court in interfering with the action of the stockholders. There was still left to the company a fair margin of profit.

The salaries as fixed are not too large, but the resolutions fixing them can, as a matter of course, have operation only for the future. There cannot be any retroactive increase of salary, or voting of back pay.

We do not think the Webbs have established their claim to take the entire profits of the 80-inch press business. This would mean the entire profits of the company from and after the demonstrated success of this 80-inch invention in 1899; for, thereafter, as we have stated, the company built only one 90-inch press, and the building of presses was the company's only source of profit. R. D. Webb testifies, and counsel for defendants says, that there were other profits; but what was, or could have been, their source we are not told. Counsel refers to certain exhibits in the record as showing $14,000 of other profits; but, so far as we can see, these exhibits show only what collections the company has made on notes given for presses sold in previous years and what property it has on hand. If profits appear on these exhibits, we are not sufficiently skilled in bookkeeping to be able to distinguish them from among the other items. If the Webbs were permitted to take all the profits of the 80-inch press business, the situation would be that the company had been operating solely for their interest from and after the beginning of 1900, barring what interest the Crichtons might have had in the liquidation of the 90-inch press business.

Of course, the Crichtons might have made an agreement to that effect; but we do not find that they did.

The only agreement which we find they made was the one entered into at the meeting of January, 1900, to the effect that they should be settled with on the return of S. J. Webb in the following March, and be let out of the company, and that in the meantime the company should exploit both presses, and all the profits of the business of the 80-inch press go to the Webbs. True, this agreement seems to have been permitted to stand until the return of S. J. Webb in the following January; and just before the meeting of January 29, 1901, the Crichtons were still willing to retire from the company on a fair settlement, and take no share in the profits of the 80-inch press business; but the agreement was not in itself a settlement, or even a definitive or unconditional agreement or contract, but merely a tentative measure towards the settlement, a plan of settlement, and it was never carried out. Taking out of this agreement, as the present contention of the Webbs would do, the provision for a settlement and a letting out of the company, and it reduces itself to the proposition that the Crichtons consented that the company should be operated for the sole and exclusive benefit of the Webbs, and they to get absolutely nothing in return.

We do not find that the Crichtons ever intended anything of that kind. Their idea was to be settled with and let out of the company. As we read their conduct, it was that of intelligent business men, recognizing the logic of the situation, and indisposed to make unnecessary trouble, but at the same time insisting upon the full measure of their substantial rights, and not relinquishing or waiving one iota thereof.

The situation was that this invention belonged exclusively to the Webbs, and the Webbs had adopted it into the business of the company, and were fully resolved to continue with it, and they had the power to do so, and for the use of it were demanding $5,000 per press, and not a cent less; that is to say, something more than the total profits of the company per press. So that it would be a mere question of keeping up that state of things long enough for all the accumulated profits of the company, as well as all its original capital stock, and all else it might possess, to pass to, and become the exclusive property of, the Webbs. Under this condition of affairs, the Crichtons had not much choice. It was either to be let out of the company on a fair settlement of the 90-inch press business, or a lawsuit. As sensible men they chose the former, and they hoped for it until at the meeting of February, 1901, the majority by formal resolution committed the company to doing business for the exclusive benefit of the Webbs; and then they had recourse to the other alternative, and instituted the receivership suit.

If the Crichtons were consenting unconditionally and unqualifiedly, as contended, to these profits going to the Webbs, it is not apparent why they kept away from the meeting of February 9, 1901, where the resolution voting these profits to the Webbs was to be passed, and was actually passed. All the other disputed points had been settled at the meeting of January 29th, and this meeting of February 9th was for the purpose of settling this 80-inch press business, and of disposing of some matters as to which there was no dispute. The very fact that the Webbs thought it necessary to pass this formal resolution, notwithstanding the absence of the Crichtons, shows that they did not consider that the matter had been finally settled by any definitive agreement. The adoption of that resolution in the absence of the Crichtons means that the Webbs intended that the matter should be settled and put at rest by force of a vote of the stockholders. So true is this that we find their counsel contending before this court that

the resolution did have that effect; t' at, there being no trust relation between the stockholders and the corporation, the Webbs could thus vote to themselves all the profits of this 80-inch press business; and that their act in doing so was final and binding on the Crichtons.

As proof of the agreement of the Crichtons to relinquish their right to participate in the profits of this 80-inch press business, counsel for defendant points with great confidence to the attitude of the Crichtons in the receivership suit. Now, if the renunciation of the Crichtons to such participation was not more unequivocal previous to that suit than it was in or by that suit, the Webbs have little indeed to stand upon in their present contention. The allegations of that suit were that the Webbs were managing the affairs of the company in their own private interest, and that a receiver was necessary to manage the affairs of the company in the interest of all the stockholders; and the prayer was that a receiver be appointed to manage the affairs of the company for the benefit of all the stockholders. There was not one word of disclaimer of the right to participate in the profits of the 80-inch press business. The company had then been exploiting the 80-inch press exclusively for nearly two years. The answer to the suit was that the appointment of a receiver was unnecessary, because the "affairs of the company were being conducted for the benefit, advantage, and profit of the stockholders, without preference or favor to any one," and that the appointment of a receiver would "prostrate the most flourishing compress company in the world"; that is to say, that the company, as a company, was "the most flourishing compress company in the world," and was being administered for the benefit of all the stockholders without discrimination. Now, if the company, as a company, was taking no part of the profits of the business it was conducting, but the Webbs were taking them all, how could it, as a company, be "the most flourishing compress company in the world"? And if the Webbs were taking all the profits of this business, and the Crichtons none of it, how could it be said that the company was being administered "for the benefit of the stockholders, without preference or favor to any one of them."

It was pending that suit that the resolution of January 17, 1902, was adopted, upon which, also, defendant's able counsel places much reliance. That resolution reads, as follows:

"Moved by Robert D. Webb, and seconded by J. E. Crichton that the company proceed at once to collect by law if necessary the Bierce note for $2,500, and interest thereon; it being fully understood and agreed that as this note is a part of the assets of the company (made before the date of this note) in which all the stockholders are interested, and that Bierce threatens to claim damages to amount of $10,000 under contract with him, and if he should sustain his claim in toto or in part the said damages and expenses of said suits be paid out of said assets in which all the stockholders are interested. The motion unanimously adopted."

In our opinion, however significant that resolution might be if standing alone, it proves nothing against the Crichtons, when read in the light of the surrounding circumstances. Pending this receivership suit, the business of the corporation had to go on, and there was but one basis on which it could proceed, and that was the basis which the majority of the stockholders had established. The Crichtons were not bound to sulk in their tents, and refuse to participate in the business of the company. The resolution might have been worded more guardedly, but we do not think that it must necessarily be construed into approval by the Crichtons of a situation against which they were judicially protesting. It recognizes the existence of a certain state of things, but does not necessarily agree to, or approve, or ratify, it.

On the question of what amount the company should be required to pay to the Webbs for the use of this 80-inch invention, the court has hesitated long, realizing that it is a

delicate thing to dictate to the owners of this invention what they shall have to accept for the use which the company has been making of it. They were unwilling to accept from the company less than $5,000 per press, and now the court is compelling them to accept less. But, under the circumstances, no other course is open, since the other alternative would be that the Webbs would be left to decide their own case, to vote to themselves the money of the corporation—an alternative totally inadmissible.

In estimating this amount the court has not the benefit of such proof as was administered in connection with the value of the use of the improvements to the 90-inch press. There, under the evidence, the court had no hesitation; here, the court finds itself compelled to grope its way to an equitable decision.

The court would remand the case if it had reason to suppose that any good could be accomplished thereby. But the situation is not the same as in the matter of the improvements to the 90-inch press. There, after payment of the royalties demanded by the Webbs, a wide margin of profit was still left to the company. Here, if the royalty demanded were paid, there would be little, if any, profit left to the company. Possibly there would not be enough to pay the royalty. Under these circumstances, there is nothing for the court to do but to fix, as best it can, what proportion of the profits should go to the owners of the invention and what proportion to the company for exploiting it.

The facts to be taken into consideration are, on one side, that the Webbs were under no obligation, legal or moral, to let the company have the benefit of this invention, but were at perfect liberty to dispose of it to others, or to organize another company to exploit it, or to retire from the management of the affairs of the company and exploit it themselves, and that any one of these courses,

especially that of retiring from the management of the affairs of the company and exploiting the invention themselves, would have been fatal to the company, so that they were in a position to dictate terms to the company.

The facts on the other side are that it was of very great advantage to the Webbs to exploit this invention by and through the company, rather than to undertake to start a new business. The company had been carrying on a prosperous business, extending to every part of the cotton growing region, and was widely and favorably known, and was operating with a large capital. Its reputation, business standing, credit, and good will was worth a great deal to the Webbs in undertaking to exploit this 80-inch invention. All the capital of the Webbs was invested in the company, and could not be available to them for a new business until after liquidation of the existing company and settlement with the Crichtons. They themselves were owners of eighty-three per cent. of the company, and were very largely interested, therefore, in not breaking it up.

The question is, what amount the parties, respectively—the Webbs representing both their interest in the invention and their interest in the company, and the Crichtons representing their interest in the company—would likely have been willing to agree to, under the circumstances, or, rather, what amount it would have been equitable for them to agree to. The Webbs furnished the invention, and the company furnished all else, including the services of the Webbs themselves, who as the salaried employés of the company owed to it their time and their business capacity and energies.

Under all the circumstances, those mentioned here and all others weighing more or less in the case, the court has concluded that a division of the profits of the 80-inch press business on the basis of one-third to the

company and two-thirds to S. J. and R. D. Webb would be fair and equitable. By "profits" is meant "net profits."

The court takes into consideration the fact that the stockholders of the company receive the additional benefit of a liquidation of the 90-inch press business through the instrumentality of the company and in due course of business, instead of by a judicial, or other more or less expensive mode of, liquidation.

It goes without saying that the court cannot and does not make a contract for the parties, but only deals with the situation in so far as it is an accomplished fact, and that this apportionment of the profits is to operate only so long as the present situation shall continue; either the company or the Webbs being at liberty to put an end to it at any time by ceasing to use the 80-inch invention in the company's business.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside; that the case be remanded for further trial in accordance with the views hereinabove expressed on the question of the expense accounts of S. J. Webb and R. D. Webb, as managers of the affairs of the corporation; that the profits realized from the 80-inch press business, exclusive of the three 80-inch presses built in 1899, be divided between the company and S. J. and R. D. Webb in the proportion of one-third to the former and two-thirds to the latter; that the resolutions fixing the salaries of S. J. Webb and R. D. Webb be made to operate only from their respective dates; that the board of directors of the corporation are hereby ordered to declare at once and pay to the stockholders, in the proportion in which they are entitled to same, a dividend of $50,000; that the report of the experts as found in the record be recast, so as to conform to the present opinion and judgment, and to such judgment as may hereafter be rendered upon the items of the expense accounts of S. J. Webb and R. D. Webb, and in all other respects it be approved; and that the defendant corporation pay the costs of this suit.

BREAUX, C. J., concurs in the decree.